UNITED STATES DISTRICT COURT
FOR THE
WESTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| ROGER DOMROES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:23-cv-41 |
| | ) | |
| ERIN WHITE et al., | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER ON PARTIAL MOTION TO DISMISS**
**(Doc. 10)**

In his First Amended Complaint, Plaintiff Roger Domroes seeks damages based on nine claims under 42 U.S.C. § 1983 against 22 defendants who were "working for or in relation to" the New York State Department of Corrections and Community Supervision's (DOCCS) Elmira Correctional Facility, where Mr. Domroes was an inmate in the facility's special housing unit between January and August 2020. (Doc. 6.) Defendants have filed a motion under Fed. R. Civ. P. 12(b)(6) seeking dismissal of Counts 7 (failure to intervene), 8 (denial of access to the grievance process), and 9 (civil conspiracy) in their entirety, and dismissal of Count 3 (retaliation) to the extent that claim is based on verbal threats.[1] (Doc. 10.) Plaintiff agrees to dismiss Count 8, but otherwise opposes the motion. (*See* Doc. 13-1 at 2 n.1.) Defendants filed a reply memorandum on July 13, 2023. (Doc. 14.) For the reasons discussed below, Defendants' motion is MOOT in part, GRANTED in part, and DENIED in part.

---

[1] The remaining counts—on which Defendants do not seek dismissal in this motion—are for excessive force (Count 1); deliberate indifference to medical needs (Count 2); cruel and unusual punishment (Count 4); mail tampering (Count 5); and malicious prosecution (Count 6).

**Background**

The 54-page Amended Complaint includes the following allegations.[2]  At the time of his

confinement at the Elmira Correctional Facility's (ECF) special housing unit (SHU), Plaintiff

was 56 years old and had Parkinson's disease, seizure disorder, narcolepsy, high blood pressure,

hypothyroidism, high cholesterol, sciatica, heart disease, and carpal tunnel syndrome.  (Doc. 6

¶ 37.)  He also had post-traumatic stress disorder "as a result of traumatic events that happened

35 years ago while he was imprisoned in the ECF."  (*Id.* ¶ 38.)  The SHU where Plaintiff was

confined was a "solitary confinement" unit without windows or proper ventilation.  (*Id.* ¶ 33.)

Plaintiff's claims arise from the following alleged incidents and events, all of which took

place before Plaintiff was released to the community in November 2020.  (*Id.* ¶ 31.)  First,

correction officers "were waiting and assaulted Plaintiff" upon his arrival at ECF on January 23,

2020.  (*Id.* ¶ 43.)  Plaintiff was handcuffed during the attack (*id.* ¶ 47) and sustained a loss of

consciousness, bruises, and abrasions.  (*Id.* ¶¶ 50, 53.)  In the course of the attack, John Does 1

and 2 and other officers said: "Welcome to Elmira, we know how to deal with scumbags like you

here."  (*Id.* ¶ 49.)  Plaintiff reported the incident to ECF Assistant Deputy Superintendent Erin

White and to DOCCS Associate Commissioner Bryan Hilton.  (*Id.* ¶¶ 54, 55.)  Neither of those

officials investigated the January 23 incident or imposed appropriate discipline.  (*Id.* ¶ 56.)

Second, a group of correction officers mocked Plaintiff on February 8, 2020.  (*Id.* ¶ 59.)

Plaintiff became upset about the taunting and spat at the officers in protest.  (*Id.* ¶ 60.)  Officers

Gilmore and John Does 3 and 4 then physically attacked Plaintiff.  (*Id.* ¶¶ 62–63.)  SHU

supervisor Sgt. Beschler was involved in the assault "or at least failed to intervene."  (*Id.* ¶ 65.)

Plaintiff was handcuffed throughout the incident and sustained a loss of consciousness and

---

[2] Some additional facts are set forth as necessary in the analysis below.

multiple physical injuries.  (*Id.* ¶¶ 68–69.)  After the incident, Plaintiff had difficulty moving and breathing; he continuously moaned in pain and he made "rasping" sounds as he struggled to breathe.  (*Id.* ¶¶ 71, 90.)

Third, ECF nurse Caroline Hakes assessed Plaintiff after he requested emergency medical assistance following the February 8 incident.  While Plaintiff was in the medical room, he overheard Sgt. Beschler whisper to Nurse Hakes that Beschler agreed "to help everyone with getting their story straight."  (*Id.* ¶ 77 (cleaned up).)  Nurse Hakes then told Plaintiff that he "looked perfectly fine except for some superficial abrasion."  (*Id.* ¶ 78.)  Eight days after the February 8 incident, ECF doctor Kevin Ott "examined Plaintiff, diagnosed him with two fractured ribs that appeared old, and told him that he was perfectly fine otherwise."  (*Id.* ¶ 81.)  Dr. Ott ordered some ibuprofen for Plaintiff and had him returned to his cell.  (*Id.* ¶ 82.)  Plaintiff's injuries were not properly diagnosed until February 27, 2020, when imaging revealed four rib fractures and a collapsed lung.  (*Id.* ¶ 89.)

On February 28, 2020, Plaintiff filed a grievance regarding the February 8 incident; the grievance was denied.  (*Id.* ¶¶ 92–93.)  February 28 also marked the beginning of a 10-day period when Plaintiff was deprived of meals without any justification.  (*Id.* ¶¶ 112–113.)  Plaintiff also reported the February 8 incident to Defendant White and personally met with her about it.  (*Id.* ¶¶ 106–107.)

Fourth, Plaintiff alleges a series of "unlawful threats and retaliation by prison officers," all carried out in response to grievances and lawsuits that Plaintiff filed or to prevent Plaintiff from reporting misconduct.  The first alleged threat was the presence of two armed officers during a transport on February 27, 2020, one of whom advised Plaintiff: "You've made people in

3

high places very unhappy, and someone wants you to have an 'accident.'"[3]  (*Id.* ¶ 100.)  In

March 2020, after Plaintiff stated an intention to file a claim for excessive force, COs Thompson

and Ferriter each threatened Plaintiff with death and also to set him up with a "new bid"—i.e., to

delay Plaintiff's release from prison by manufacturing a felony case against him.  (*Id.* ¶¶ 114–

125.)  Lt. Wilcox also told Plaintiff that he was writing "too many grievances."  (*Id.* ¶ 129.)

 Fifth, CO Thompson bent and twisted Plaintiff's right wrist on the morning of April 8,

2020.  (*Id.* ¶¶ 141–144.)  Sergeant Sears admonished other officers at the scene for not helping

CO Thompson and ordered officers to ensure that they blocked surveillance cameras from

filming the event.  (*Id.* ¶¶ 144–145.)  Plaintiff alleges that Thompson and Sears used force on

this occasion because the prior verbal threats had failed to compel Plaintiff to withdraw his

grievances and complaints.  (*Id.* ¶ 294.)  Nurse Hakes subsequently rejected and ignored

Plaintiff's multiple requests for treatment of his right wrist.  (*Id.* ¶ 149.)

 Plaintiff began tossing waste from the toilet in his cell on or about April 9, 2020 "due to

his mental breakdown and as a sign of protest."  (*Id.* ¶ 180.)  Also, soon after the April 8

incident—on the basis of an unfounded "cell visibility obstruction misbehavior"—CO Thompson

ordered the removal of almost all of Plaintiff's items in the cell; that the cell's water supply be

shut down; and that Plaintiff's meals be halted.  (*Id.* ¶¶ 150–154.)  This alleged deprivation of

food, water, and hygiene supplies lasted for three weeks.  (*Id.* ¶ 164.)  Plaintiff alleges that as a

result of these deprivations, he was "covered with sores and filth, became sick, dehydrated, and

malnourished, and was in anguishing psychological turmoil."  (*Id.* ¶ 161.)

 Sixth, on the morning of April 12, 2020, the Correctional Emergency Response Team

(CERT) removed Plaintiff from his cell.  (*Id.* ¶ 197.)  When Plaintiff inquired about what was

---

[3] The two armed officers are not named as defendants.

going on, Defendants Coolbaugh and Crozier replied that "this is what happens when [you] throw[] things at an officer." (*Id.* ¶ 198.) Earlier on the morning of April 12, before the CERT team's arrival, Plaintiff interacted with CO Ferriter, who accused Plaintiff of being a "thrower" and a "spitter." (*Id.* ¶ 189.) Plaintiff states that he did not throw feces or substances at CO Ferriter on April 12, 2020. (*Id.* ¶ 215.) The CERT team entered Plaintiff's cell and took photographs and officers collected other evidence from the cell. (*Id.* ¶¶ 197, 202.)

While the officers were collecting evidence from the cell, "someone raised concerns and ethical issues." (*Id.* ¶ 207.) Several unidentified individuals—whom Plaintiff asserts on information and belief are among the defendants—responded. One individual stated that Plaintiff "deserved what he was getting and that it was necessary to take matters into their own hands." (*Id.* ¶ 208.) Another individual commented that "the mess made by Plaintiff prior to the incident made [it] easier to stage a crime scene and that it was a good opportunity to capitalize." (*Id.* ¶ 209.) A third individual remarked that Ferriter had experience "setting these scumbags up." (*Id.* ¶ 210.) In response to a concern about the video not corroborating Ferriter's story, one individual responded that it did not matter "so long as everybody was on the same page." (*Id.* ¶ 211.) Several of the defendants placed a plexiglass shield near the cell door as "evidence" of Plaintiff assaulting officers. (*Id.* ¶ 213.)

Plaintiff was indicted on charges of aggravated harassment of an employee by an inmate; he also faced disciplinary charges within the EFC facility. (*Id.* ¶¶ 220, 227, 228.) Before the indictment, Plaintiff mailed a letter to the prosecutor's office seeking to exercise his right to testify to the grand jury under N.Y. Crim. Proc. Law § 190.50. Defendant John Doe 5, a DOCCS employee in the Office of Special Investigations, intercepted the § 190.50 letter and prevented its delivery. Plaintiff was unable to testify before the grand jury. (*Id.* ¶¶ 27, 330–

5

334.)  A video recording of the events on April 12, 2020 was erased before Plaintiff could obtain
the recording.  (*Id.* ¶ 230.)  The indictment was ultimately dismissed (*id.* ¶ 227) and the
disciplinary hearing found that CO Ferriter's claims against Plaintiff were unsubstantiated (*id.*
¶ 229).

Finally, Plaintiff alleges that he sent numerous grievances during his time at ECF and that
defendant Lt. Wilcox, who had access to the grievance deposit box, "prevented Plaintiff's
grievances from getting filed" and "intercepted" at least 30 grievances.  (*Id.* ¶¶ 240, 251.)  Lt.
Wilcox also allegedly threatened Plaintiff by saying that the conditions of confinement would get
worse if Plaintiff did not stop sending grievances.  (*Id.* ¶¶ 244, 245, 257–258.)  Plaintiff further
alleges that, in violation of DOCCS directives, Lt. Wilcox and grievance supervisor Misty
O'Dell shared the contents of the grievances with other officers, "thereby exposing Plaintiff to
the risk of retaliation by ECF officers."  (*Id.* ¶¶ 252, 256.)

## Rule 12(b)(6) Standard

On a Rule 12(b)(6) motion, the court's task is to determine whether, accepting as true the
complaint's non-conclusory allegations, "and drawing all reasonable inferences in favor of the
non-movant, plaintiffs have stated a facially valid claim." *Ocasio v. City of Canandaigua*,
513 F. Supp. 3d 310, 319 (W.D.N.Y. 2021) (cleaned up).  "In order to be found sufficient, a
pleading must set forth sufficient facts to suggest that a cause of action is legally plausible." *Id.*
(citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "Ultimately, where a plaintiff has
not nudged their claim across the line from conceivable to plausible, their complaint must be
dismissed." *Id.* (cleaned up).

## Analysis

All of Plaintiff's claims are brought under 42 U.S.C. § 1983. Section 1983 provides a private cause of action for individuals to sue a "person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. "The purpose of § 1983 is to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails." *Wyatt v. Cole*, 504 U.S. 158, 161 (1992). Section 1983 does not itself create or establish a federally protected right; instead it creates a cause of action to enforce federal rights created elsewhere, such as a federal constitutional right. *Albright v. Oliver*, 510 U.S. 266, 271 (1994).

The nine § 1983 claims in the Amended Complaint assert violations of a variety of rights. Defendants' motion seeks dismissal of Counts 7 (failure to intervene), 8 (denial of access to the grievance process), and 9 (civil conspiracy) in their entirety, and dismissal of Count 3 (retaliation) to the extent that claim is based on verbal threats. (Doc. 10.) As noted above, Plaintiff has withdrawn Count 8. (Doc. 13-1 at 2 n.1.) The court proceeds to consider Defendants' motion challenging Counts 3, 7, and 9.

## I.   First Amendment Retaliation (Count 3)

In Count 3, Plaintiff claims that multiple defendants[4] retaliated against him for filing a lawsuit, lodging grievances against ECF staff, or engaging in "other protected free speech activity." (Doc. 6 ¶ 288.) The alleged retaliation included Thompson and Ferriter's death threats

---

[4] Count 3 is brought against Nurse Hakes; COs Thompson, Ferriter, Diamond, Hicks, and Thomas; Sergeants Sears, Coolbaugh, and Crozier; and Lieutenants Wilcox and Schadewald.

and threats to delay Plaintiff's release. (*Id.* ¶¶ 289–293.) Then, according to Plaintiff,

Defendants Thompson and Sears resorted to physical abuse (the incident on April 8, 2020), and

then to the alleged "deprivation of access to water, basic hygiene, and access to pen, papers, legal

work and materials, and medical supplements by Defendant Thompson, Sears, and Hakes." (*Id.*

¶ 299.) Plaintiff alleges that this conduct was "part of a grand scheme to retaliate [against]

Plaintiff for filing grievances and prevent Plaintiff from filing grievances and continuing legal

claims." (*Id.*) Plaintiff alleges that this conduct, in addition to the alleged "assault and battery"

and malicious prosecution, was "preplanned and orchestrated by Defendants, mainly Defendant

Thompson and Ferriter." (*Id.* ¶ 303.)

Defendants assert that Count 3 "is largely premised on the verbal threats of Defendants

Thompson, Ferriter and Wilcox chilling Plaintiff's First Amendment right to free speech."

(Doc. 10-1 at 19.) Defendants seek dismissal of Count 3 against those defendants "to the extent

the retaliation claims are based on verbal threats." (*Id.* at 7.) Plaintiff maintains that he is not

suing Defendants "for mere insults" and that the alleged retaliation consisted of "more than

verbal threats." (Doc. 13-1 at 19.)

"To make out a 'prima facie case of First Amendment retaliation, a plaintiff must

establish (1) that the speech or conduct at issue was protected, (2) that the defendant took

adverse action against the plaintiff, and (3) that there was a causal connection between the

protected speech and the adverse action.'" *Shara v. Maine-Endwell Cent. Sch. Dist.*, 46 F.4th 77,

82 (2d Cir. 2022) (quoting *Scott v. Coughlin*, 344 F.3d 282, 287 (2d Cir. 2003)). Defendants

challenge the plausibility of Plaintiff's allegations on the second element. They also raise a

qualified immunity argument.

A.      **Adverse Action**

This court has held that "verbal harassment, or even threats, are generally held not to rise

to the level of adverse action that will support a First Amendment retaliation claim." *Rosales v.*

*Kikendall*, 677 F. Supp. 2d 643, 648 (W.D.N.Y. 2010); *see also Alnutt v. Cleary*, 913 F. Supp.

160, 165 (W.D.N.Y. 1996) ("[M]ere threatening language and gestures of a custodial officer do

not, even if true, amount to constitutional violations." (quoting *Williams v. Pecchio*, 543 F. Supp.

878, 879–80 (W.D.N.Y. 1982))).  On that basis, Defendants seek dismissal of the retaliation

claims against Lt. Wilcox and COs Thompson and Ferriter "to the extent the retaliation claims

are based on verbal threats."  (Doc. 10 at 7.)

The court is not persuaded that Defendants can dispose of the allegations of verbal threats

by decoupling them from the other alleged adverse actions.  As this court has recognized,

"whether verbal[] threats sufficiently constitute adverse action may depend on their specificity

and the context in which they are uttered." *Vallade v. Fischer*, No. 12-CV-231M, 2012 WL

4103864, at *7 (W.D.N.Y. Sept. 13, 2012) (internal quotation marks omitted).  The *Vallade* court

therefore allowed a retaliation claim to proceed where "other adverse action followed the threat

(*i.e.*, denial of food and recreation)." *Id.*

Here, accepting the Amended Complaint's allegations as true and drawing all reasonable

inferences in Plaintiff's favor, the court concludes that the alleged verbal harassment—when

considered in the context of the other alleged conduct—constitutes plausible adverse action.

CO Thompson and Ferriter's alleged verbal threats in March 2020 were followed by

Thompson's alleged physical abuse on April 8, 2020 and Thompson's alleged orders to shut

down the water supply to Plaintiff's cell and halt his meal supply.  Lt. Wilcox's statement to

Plaintiff in March 2020 that Plaintiff was filing too many grievances was followed by Wilcox's

alleged interceptions of Plaintiff's grievances and by Wilcox's alleged statement on April 27, 2020 that filing more grievances could worsen Plaintiff's conditions of confinement.[5]

## B.  Qualified Immunity (Verbal Threats or Harassment)

Defendants also assert that they are entitled to qualified immunity from Plaintiff's claims of verbal harassment.  (Doc. 10-1 at 20.)  Citing their argument that the verbal threats do not constitute adverse action, Defendants contend that they "should be entitled to qualified immunity from Plaintiff's claims concerning verbal threats and harassment because that conduct is not prohibited by Federal law, constitutional or otherwise."  (Doc. 10-1 at 21.)  Plaintiff maintains that qualified immunity is unavailable because, after issuing verbal threats, Defendants "followed up with actual physical assault that involved permanent physical injury, prolonged deprivation, and malicious prosecution based on false charges."  (Doc. 13-1 at 18–19.)

"[Q]ualified immunity shields public officials from liability for their discretionary acts that do not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Collymore v. Krystal Myers, RN*, 74 F.4th 22, 30 (2d Cir. 2023) (internal quotation marks omitted); *see also Kew v. Town of Northfield*, No. 19-cv-78, 2023 WL 4172741, at *15 (D. Vt. Apr. 17, 2023); *Powell v. City of Jamestown*, No. 21-cv-721, 2022 WL 1913581, at *6 (W.D.N.Y. June 3, 2022).  "Qualified immunity bars a plaintiff's claim unless (1) the official violated a statutory or constitutional right, and (2) that right was clearly established at the time of the challenged conduct."  *Matzell v. Annucci*, 64 F.4th 425, 434 (2d Cir. 2023).  "Courts have discretion to decide which of the two prongs to address first, but if

---

[5] The court therefore also rejects Defendants' suggestion that the verbal threats were merely "de minimis."  (Doc. 10-1 at 20.)  Even if the verbal threats could be considered "de minimis" in isolation, the court must consider that conduct in the context of the other alleged conduct.

the complaint fails to sufficiently plead the violation of a constitutional right, the second question is moot." *Id.* (quoting *Nat'l Rifle Ass'n of Am. v. Vullo*, 49 F.4th 700, 714 (2d Cir. 2022)). "Where a defendant presents a qualified immunity defense on a motion to dismiss . . ., 'the plaintiff is entitled to all reasonable inferences from the facts alleged, not only those that support his claim, but also those that defeat the immunity defense.'" *Id.* (quoting *McKenna v. Wright*, 386 F.3d 432, 436 (2d Cir. 2004)).

The court understands Defendants' argument to be based on the first prong of the qualified immunity analysis. According to Defendants, Plaintiff's claims concerning verbal threats and harassment are claims of "conduct [that] is not prohibited by Federal law, constitutional or otherwise." (Doc. 10-1 at 21.) But, for the reasons discussed above, the court concludes that Plaintiff's claims of verbal threats must be considered in the context of all of the alleged conduct, and in that context the alleged verbal harassment constitutes plausible adverse action. Qualified immunity does not shield Defendants from Count 3 at this stage of the case.

## II.    Failure to Intervene (Count 7)

The failure-to-intervene claim is brought against eleven individuals: Assistant Deputy Superintendent White; Associate Commissioner Hilton; Nurse Hakes; and correction officers Diamond, Hicks, Thomas, John Doe 4, Wilcox, Coolbaugh, Schadewald, and Crozier. Defendants argue that the Amended Complaint does not plausibly allege any failure-to-intervene claims against any of those individuals. (Doc. 10-1 at 12.) Plaintiff maintains that his allegations plausibly support a finding that each defendant named in Count 7 "personally was involved in multiple violations of his Constitutional rights." (Doc. 13-1 at 8.)

"[A]ll law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their

presence." *Sloley v. VanBramer*, 945 F.3d 30, 46–47 (2d Cir. 2019) (quoting *Anderson v.*

*Branen*, 17 F.3d 552, 557 (2d Cir. 1994)); *see also Ragsdale v. Confer*, No. 21-CV-6188,

2021 WL 8821927, at *4 (W.D.N.Y. July 8, 2021) ("Prison officials can be held liable

under 42 U.S.C. § 1983 for failing to intervene in a situation where another official is violating

an inmate's constitutional rights, including the use of excessive force, in their presence.").

> To state a claim against an officer for his or her failure to intervene, a plaintiff must allege facts demonstrating that (1) the officer had a realistic opportunity to intervene and prevent the harm; (2) the officer knew that the victim's constitutional rights were being violated; and (3) the officer did not take reasonable steps to intervene.

*Flannery v. City of Rochester*, 640 F. Supp. 3d 267 (W.D.N.Y. 2022) (cleaned up).

As with other § 1983 damages claims, the plaintiff must also allege that the defendant

was personally involved. *See Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) ("It is well settled

in this Circuit that 'personal involvement of defendants in alleged constitutional deprivations is a

prerequisite to an award of damages under § 1983." (quoting *Moffitt v. Town of Brookfield*,

950 F.2d 880, 885 (2d Cir. 1991))).  "With respect to a claim of failure to intervene, an officer is

personally involved in the alleged constitutional deprivation if he was present when it occurred,

yet failed to intercede on behalf of the victim even though he had a reasonable opportunity to do

so." *Hester v. Regan*, No. 20-CV-1153, 2023 WL 5610754, at *6 (N.D.N.Y. Aug. 30, 2023)

(internal quotation marks omitted).

## A.    Assistant Deputy Superintendent White

According to the Amended Complaint, Assistant Deputy Superintendent White was

present at ECF at all relevant times.  (Doc. 6 ¶ 356.)  The Amended Complaint includes

allegations that Plaintiff notified Defendant White of the alleged January 23 and February 8,

2020 attacks.  (*See id.* ¶¶ 54, 106.)  The Amended Complaint also alleges that White did not take

appropriate action in response.  (*See id.* ¶¶ 56, 110.)  Plaintiff further alleges that he filed

grievances notifying Defendant White of the "horrible conditions" to which he was subjected but that White did not take "any measures to stop unlawful harassment by ECF correctional officers." (*Id.* ¶¶ 133, 135.)  The defense argues that "Plaintiff does not allege that White personally witnessed him being harmed and failed to intervene/prevent it" and that "[i]nstead, Plaintiff has attempted to raise a *de-facto* supervisory liability claim against White for failing to prevent alleged constitutional violations by other Elmira staff allegedly under her supervision and control." (Doc. 10-1 at 12–13.)

The court concludes that Plaintiff has failed to allege a plausible failure-to-intervene claim against White insofar as that claim is based on the January 23 and February 8, 2020 attacks.  Although the Amended Complaint alleges that White was present at ECF at all relevant times, nothing in the pleadings suggests or supports an inference that White was personally present at the SHU at the times of the alleged January 23 and February 8, 2020 incidents.  The allegations that Plaintiff notified White after those incidents are insufficient to support a failure-to-intervene claim. *See Ragsdale*, 2021 WL 8821927, at *4 (dismissing failure-to-intervene claim against prison superintendent because prisoner's notice to superintendent of alleged misconduct by correction officers did not "plausibly allege [superintendent's] personal involvement in the use of force").

The analysis is different insofar as Plaintiff might be suing White for "failure to intervene" in response to Plaintiff's conditions of his confinement.  The Amended Complaint does not name White as a defendant with respect to Count 2 (deliberate indifference to medical needs) or Count 4 (denial of minimum standard of living constituting cruel and unusual punishment).  But in his opposition memorandum, Plaintiff asserts that "Defendant White failed to intervene despite being aware that Plaintiff was under serious threat of harm by prison

officials through prolonged deprivation of food, water, and access to basic hygiene supplies, as well as multiple incidents of serious physical assaults." (Doc. 13-1 at 9.)

The court concludes that Plaintiff has failed to state a plausible "failure to intervene" claim against White based on that alleged "prolonged deprivation." According to the Amended Complaint, Plaintiff was unable to file grievances during the three-week period when he was allegedly deprived of food, water, and hygiene supplies because he was also deprived of access to writing supplies during that time. (*See* Doc. 6 ¶¶ 299, 314.) Therefore, White could not have learned of the allegedly unconstitutional conditions of confinement from any contemporaneous grievance. The court finds no allegation in the Amended Complaint that supports Plaintiff's conclusory assertion in his reply memorandum that White was "aware" of the "prolonged deprivation" (Doc. 13-1 at 9) during that three-week period.

### B.      Associate Commissioner Hilton

According to the Amended Complaint, Defendant Hilton was present at ECF at all relevant times. (Doc. 6 ¶ 364.) In September 2019—before Plaintiff arrived at ECF—a legal intern contacted Defendant Hilton asking him "to review Plaintiff's case and to make sure that there was a legitimate basis for Plaintiff's continuous confinement at the SHU" and "to ensure that Plaintiff receives proper clinical care." (*Id.* ¶ 41.) Similar to the allegations against Defendant White, the Amended Complaint alleges that Plaintiff notified Hilton of the alleged January 23 and February 8, 2020 attacks. (*See id.* ¶¶ 55, 108, 134.) The Amended Complaint also alleges that Hilton did not take appropriate action in response. (*See id.* ¶¶ 56, 110, 135.) Plaintiff further alleges that he filed grievances notifying Hilton of the "horrible conditions" to which he was subjected but that Hilton did not take "any measures to stop unlawful harassment by ECF correctional officers." (*Id.* ¶¶ 133, 135.)

14

The result as to Count 7 against Hilton is the same as the result for Defendant White. Because there are no allegations that Hilton was personally present at the SHU at the times of the alleged January 23 and February 8, 2020 attacks, Plaintiff has failed to state a plausible failure-to-intervene claim against White insofar as that claim is based on those incidents.  Although the Amended Complaint includes allegations that Plaintiff sent grievances to Hilton (*id.* ¶¶ 133–134) and that Hilton visited Plaintiff at the SHU on multiple occasions (*id.* ¶ 359), there are no allegations that Hilton learned of the allegedly unconstitutional "prolonged deprivation" from any contemporaneous grievance and no allegation that Hilton was aware of Plaintiff's conditions of confinement during that three-week period.

## C.    Nurse Hakes

As noted above, Plaintiff alleges that Nurse Hakes failed to recognize his serious medical condition after the February 8 incident.  She also allegedly rejected and ignored Plaintiff's multiple requests for treatment of his right wrist after the April 8 incident.  The Amended Complaint further alleges that Nurse Hakes ignored Plaintiff's requests for medical attention during the three-week period in April when Plaintiff was on deprivation orders (Doc. 6 ¶¶ 158, 171) and also deprived Plaintiff of nutritional supplements and skin cream during that time (*id.* ¶ 176).

The defense argues that Plaintiff's failure-to-protect claim against Nurse Hakes is "wholly conclusory and entirely duplicative of his second and third claims for relief, and fails to plausibly allege the elements of a failure to protect claim."  (Doc. 10-1 at 16.)  Plaintiff maintains that a defendant's direct involvement does not defeat a failure-to-intervene claim.  (Doc. 13-1 at 12.)  Plaintiff further contends that he has sufficiently alleged that Hakes "knew of the

ongoing Constitutional violations committed by prison officers against Plaintiff" and that she

could have intervened to restore Plaintiff's access to water, food, and medical supplies. (*Id.*)

As against Nurse Hakes, the Amended Complaint includes the failure-to-intervene claim

in Count 7 as well as claims of direct participation in alleged constitutional violations (including

Counts 2, 3, and 4). Plaintiff notes that courts have allowed claims for direct participation and

failure to intervene to be pled in the alternative "where a plaintiff has sufficiently pled an

underlying constitutional violation, with the caveat that the plaintiff later specify which

defendants he seeks to hold liable for the direct constitutional violation versus which he seeks to

hold liable for failure to intervene." *Leckie v. City of New York*, No. 19-CV-6719, 2022 WL

2442375, at *18 (S.D.N.Y. June 30, 2022), *report and recommendation adopted in pertinent part*

2023 WL 3168699, at *15 (S.D.N.Y. May 1, 2023).

But the cases where courts have allowed both theories to proceed typically involve

situations where there are "overlapping" direct and failure-to-intervene claims against multiple

defendants. *See, e.g.*, *Hincapie v. City of New York*, No. 18-CV-3422, 2022 WL 2870411, at *6

(S.D.N.Y. July 21, 2022) (section 1983 plaintiff filed a "slew" of claims—direct and failure-to-

intervene—against numerous law enforcement personnel who investigated and prosecuted a

notorious subway killing); *Cumberbatch v. Port Auth. of N.Y. & N.J.*, No. 03 Civ. 749, 2006 WL

3543670, at *11 (S.D.N.Y. Dec. 5, 2006) (construing failure-to-intervene claims as pleading in

the alternative to direct claims—"*i.e.*, the Officers either used excessive force, or one or both of

them failed to intervene while another officer used excessive force").

Here, Plaintiff's failure-to-intervene claim against Nurse Hakes cannot be construed in

the alternative insofar as it is based on Hakes's alleged "ignoring" Plaintiff's injuries after the

February 8 and April 8 incidents or based on her alleged decision to deprive Plaintiff of the

nutritional supplements and skin cream.  There are no other medical providers whom Plaintiff

alleges were involved in that conduct.[6]  Nurse Hakes's alleged direct participation in those

events makes the failure-to-intervene theory "inapplicable" to those claims.  *Leckie*, 2022 WL

2442375, at *18 (quoting *Sanabria v. Detective Shawn Tezlof*, No. 11-CV-6578, 2016 WL

4371750, at *5 (S.D.N.Y. Aug. 12, 2016)); *see also Buari v. City of New York*, 530 F. Supp. 3d

356, 392 (S.D.N.Y. 2021) ("[D]efendants cannot be liable for both the underlying constitutional

deprivation and a failure to intervene to stop themselves from committing that violation."

(quoting *Marom v. City of New York*, No. 15-cv-2017, 2016 WL 916424, at *19 (S.D.N.Y.

Mar. 7, 2016))).

     The result is different for Plaintiff's claim based on Nurse Hakes's alleged failure to

intervene and restore Plaintiff's access to water, food, and medical supplies.  The defense motion

does not challenge Count 4 (denial of minimum standard of living), so the court assumes for

present purposes (without deciding) that the conditions fell below constitutional standards.  The

court can infer from the Amended Complaint that Nurse Hakes was aware of Plaintiff's

conditions of confinement during the period in April when Plaintiff was on deprivation orders.

(*See* Doc. 6 ¶¶ 158, 171 (allegations that Hakes knew Plaintiff sought medical help but ignored

him); *id.* ¶¶ 173–174 (another provider ordered medical supplies and noted Plaintiff was

subjected to "inhumane" conditions; Nurse Hakes subsequently learned of that provider's

conduct); *id.* ¶ 375 ("Hakes heard or saw Plaintiff asking for help due to injuries and inhumane

conditions subjected to him by other officers.").)

---

[6] The Amended Complaint does allege that Dr. Ott failed to recognize Plaintiff's medical
condition after the February 8 incident (Doc. 6 ¶¶ 81–83), but that was different conduct and
there is no allegation that Dr. Ott was present when Nurse Hakes assessed Plaintiff or vice versa.

Although it is unclear whether Nurse Hakes herself had authority to countermand Thompson's deprivation orders, the court infers that she could have reported unlawful deprivations to DOCCS personnel who did have that authority. For present purposes, that constitutes a plausible realistic opportunity and a reasonable step to intervene. *See Ransom v. Lee*, No. CV 14-600, 2017 WL 10525951, at *9 (C.D. Cal. Apr. 20, 2017) (denying motion to dismiss claim based on officers' alleged failure to intervene in withholding of prisoner's food trays), *report and recommendation adopted* 2017 WL 10510170 (C.D. Cal. June 27, 2017).

## D.     Lt. Wilcox

The Amended Complaint alleges that Lt. Wilcox was an Inmate Grievance Resolution Committee (IGRC) staff member and a watch commander. (Doc. 6 ¶¶ 237–238.) Count 7 asserts the following against Lt. Wilcox:

- "As a grievance investigation officer, Defendant Wilcox knew or should have known about the retaliatory threats and inhumane conditions Plaintiff was going through";

- "Defendant Wilcox had a duty to protect Plaintiff from cruel and unusual punishment by his fellow correctional officers";

- "Defendant Wilcox, however, deliberately ignored the actions of other correctional officers subjecting Plaintiff to cruel and unusual punishment in violation of his Eighth Amendment right";

- "Defendant Wilcox not only failed to intervene, but he also engaged in conduct that aided and abetted unlawful actions of his fellow officers, such as by interfering with Plaintiff's grievance filings and making unlawful threat[s] to Plaintiff to prevent him from pursuing legal actions/grievances."

(*Id.* ¶¶ 370–373.)

The defense argues that Plaintiff's allegations do not state a failure-to-protect claim because Wilcox "is not alleged to have personally witnessed Plaintiff in physical danger, or experiencing some other deprivation of his constitutional rights, and then failed to intervene to stop that deprivation." (Doc. 10-1 at 15.)  The defense also asserts that Count 7 against Lt. Wilcox "is an improper attempt to either raise a supervisory liability claim against Wilcox . . . or to improperly attribute liability to Wilcox under a theory of respondeat superior." (*Id.*)  Plaintiff maintains that the allegations indicate that Wilcox "was well aware of the nature of the ongoing Constitutional violations against Plaintiff, as well as the substantial risk of harm he faced while in custody." (Doc. 13-1 at 11.)

Although the Amended Complaint includes allegations that Plaintiff sent numerous grievances to Wilcox (*see* Doc. 6 ¶ 251), Plaintiff was unable to file grievances during the three-week period when he was allegedly deprived of food, water, and hygiene supplies because he was also deprived of access to writing supplies during that time. (*See id.* ¶¶ 299, 314.) However, according to the Amended Complaint, Wilcox visited Plaintiff on April 27, 2020 and observed the alleged "horrendous conditions" that Plaintiff was enduring while under deprivation orders. (*Id.* ¶¶ 244–245.)  The court infers that Plaintiff also complained to Wilcox about the alleged deprivations on April 27, 2020. (*See id.* ¶¶ 257–258 (Wilcox allegedly responded that the conditions could get even worse).)  That was two days before the deprivation orders were lifted on April 29, 2020. (*Id.* ¶ 316.)

The court therefore concludes that Count 7 against Lt. Wilcox is plausible for the same reasons that it is plausible against Nurse Hakes.  After observing Plaintiff's conditions of confinement and hearing Plaintiff's complaints about the alleged deprivations, Wilcox had a

realistic opportunity to intervene and allegedly failed to do so. That is sufficient at this stage of the case. *See Ransom v. Lee*, No. CV 14-600, 2017 WL 10525951, at *9 (C.D. Cal. Apr. 20, 2017) (denying motion to dismiss claim based on officers' alleged failure to intervene in withholding of prisoner's food trays), *report and recommendation adopted* 2017 WL 10510170 (C.D. Cal. June 27, 2017).

### E.      Bruce Coolbaugh

The Amended Complaint alleges that Defendant Coolbaugh[7] was "a regular officer in the SHU and oversaw the operation therein." (Doc. 6 ¶ 21.) "As such," Plaintiff alleges, Coolbaugh "knew or should have been aware of cruel and unusual punishment, such as the second incident on February 8, 2020, the third incident on April 8, 2020, and prolonged deprivation of food, water, and access to basic hygiene supplies by other SHU officers." (*Id.* ¶ 379.) According to the Amended Complaint, all of those violations occurred while Coolbaugh "was at the scene or when he was supposed to oversee the SHU inmates, including Plaintiff." (*Id.* ¶ 380.) Coolbaugh was allegedly one of the officers who accompanied the CERT team when Plaintiff was removed from his cell on April 12, 2020. (*Id.* ¶ 197.) The Amended Complaint asserts that Coolbaugh participated in "stag[ing] a crime scene" (*id.* ¶ 216) and in pursuing criminal charges against Plaintiff for aggravated harassment of an employee by an inmate (*id.* ¶ 220).

The defense asserts that Count 7 against Lt. Coolbaugh is "devoid of any additional facts suggesting Coolbaugh witnessed others depriving Plaintiff of his constitutional rights, or that he was deliberately indifferent to the same." (Doc. 10-1 at 17.) Plaintiff argues that Count 7 against Coolbaugh "should be allowed to proceed . . . as alternative relief." (Doc. 13-1 at 13.)

---

[7] The Amended Complaint describes Defendant Coolbaugh as both a sergeant and a lieutenant. (*See* Doc. 6 ¶¶ 21, 379.) His precise rank is not material to any present issue.

Plaintiff also asserts that Coolbaugh "was present at the scene when Plaintiff was subjected to violations of his Constitutional rights, knew that it was going on, and chose to deliberately ignore it or, worse, at times was even a direct participant." (*Id.*)

The court concludes that the Amended Complaint lacks plausible allegations that Coolbaugh was present at the February 8 and April 8 incidents such that he had any realistic opportunity to intervene. He might have learned of those incidents after they occurred. But the fact that Coolbaugh was a regular officer in the SHU with oversight responsibilities is insufficient to support an inference that he had any opportunity to intervene in those alleged attacks while they were occurring.

On the other hand, insofar as Count 7 against Coolbaugh is based on failure to intervene to stop unlawful conditions of confinement, that count is plausible for the same reasons that it is plausible against Nurse Hakes and Lt. Wilcox. The Amended Complaint alleges that Coolbaugh was a "regular" officer in the SHU with oversight responsibilities. (Doc. 6 ¶ 21.) The court can infer that he observed Plaintiff's conditions of confinement, was aware of Plaintiff's complaints about the alleged deprivations, and that Coolbaugh had a realistic opportunity to intervene, including by countermanding the deprivation order or reporting the circumstances to an appropriate authority. That is sufficient at this stage of the case.

### F.      Lt. Schadewald, Sgt. Crozier, and COs Diamond, Hicks, and Thomas

The defense asserts that the Amended Complaint alleges that Lt. Schadewald participated in an effort to frame Plaintiff but that no allegations plausibly suggest that Schadwald had the opportunity to prevent some other constitutional violation. (Doc. 10-1 at 18.) The defense likewise asserts that the Amended Complaint lacks any allegations either that defendants Crozier, Diamond, Hicks, and Thomas witnessed other officers violating Plaintiff's rights or

about how they could have intervened.  (*Id.* at 18–19.)  Plaintiff maintains that each of these defendants "were direct participants in the violations of Plaintiff's Constitutional rights by participating in the malicious prosecution of Plaintiff" and that the direct claims should not prevent the failure-to-intervene claim from proceeding at this stage of the case "as an alternative form of relief."  (Doc. 13-1 at 14.)

The Amended Complaint names Schadewald, Crozier, Diamond, Hicks, and Thomas in the malicious-prosecution claim (Count 6).  The defense motion does not seek dismissal of that count.  The court observes that Count 7 against this group of defendants can be seen as "overlapping" direct and failure-to-intervene claims against multiple defendants.  These officers allegedly either participated in the malicious prosecution, or they failed to intervene while other officers in the group pursued the prosecution.  *Cf. Cumberbatch*, 2006 WL 3543670, at *11.

## III.    Conspiracy Claim (Count 9)

The conspiracy claim in Count 9 incorporates the entire "factual background" alleged in the Amended Complaint (Doc. 6 ¶¶ 31–258) and all of the allegations in the first eight counts (*see id.* ¶ 392).  Count 9 is the only count brought against all 22 defendants.  Plaintiff alleges that Defendants conspired in the following five ways:

- "[T]o retaliate against Plaintiff for filing grievances and initiating lawsuits against officers who assaulted him during the February 8 incident";

- "[T]o prevent Plaintiff from filing grievances and initiating lawsuits against the officers";

- "[T]o prevent Plaintiff from accessing court to defend himself against criminal charges";

- "[T]o maliciously and sadistically harm Plaintiff"; and

- "[T]o deprive Plaintiff of access to adequate medical care."

(Doc. 6 ¶¶ 393–397.)

Defendants seek dismissal of Count 9 on two grounds.  First, Defendants contend that the Amended Complaint lacks sufficient allegations to meet the pleading standard for § 1983 conspiracy claims.  (Doc. 10-1 at 9–10.)  Second, Defendants argue that the intra-agency conspiracy doctrine bars Count 9.  (*Id.* at 10.)

### A.    Sufficiency of the Pleading Under *Ciambriello*

"To plead a conspiracy claim, Plaintiff must allege facts supporting '(1) an agreement between two or more state actors or between a state actor and a private entity, (2) to act in concert to inflict an unconstitutional injury, and (3) an overt act done in furtherance of that goal, causing damages.'"  *Houghtaling v. Downes*, 623 F. Supp. 3d 145, 159 (W.D.N.Y. 2022) (quoting *Pangburn v. Culbertson*, 200 F.3d 65, 72 (2d Cir. 1999)).  "[C]omplaints containing only conclusory, vague, or general allegations that the defendants have engaged in a conspiracy to deprive the plaintiff of his constitutional rights are properly dismissed; diffuse and expansive allegations are insufficient, unless amplified by specific instances of misconduct."  *Ciambriello v. County of Nassau*, 292 F.3d 307, 325 (2d Cir. 2002); *see also Houghtaling*, 623 F. Supp. 3d at 159 (same).  "A plaintiff is not required to list the place and date of defendants' meetings and the summary of their conversations when he pleads conspiracy, . . . but at the very least the pleadings must present 'specific facts tending to show agreement and concerted action.'"  *Tripathy v. Brotz*, No. 22-cv-06469, 2023 WL 4032831, at *11 (W.D.N.Y. June 15, 2023) (quoting *Bacquie v. City of New York*, No. 99CIV.10951, 2000 WL 1051904, at *1 (S.D.N.Y. July 31, 2000)).  "Without 'a meeting of the minds, the independent acts of two or more wrongdoers do not amount to a conspiracy.'"  *Id.* (quoting *Fisk v. Letterman*, 401 F. Supp. 2d 362, 376 (S.D.N.Y. 2005)).

Defendants argue that the Amended Complaint fails to meet these standards because, according to Defendants, "[t]here are no facts describing which defendants conspired together, what agreement was reached, when that agreement was reached, or what overt acts each defendant committed in furtherance of the alleged conspiracy." (Doc. 10-1 at 10.)  Plaintiff maintains that the Amended Complaint includes the following "factual details that demonstrate a plausible factual basis" for Count 9:

- Sgt. Beschler's alleged statement to Nurse Hakes that Beschler agreed "to help everyone with getting their story straight" and Hakes's subsequent statement to Plaintiff that he looked fine except for some superficial abrasion;

- The alleged statement by one of the two armed officers during the February 27, 2020 transport that Plaintiff "made people in high places very unhappy, and someone wants you to have an 'accident'";

- Thompson and Ferriter's alleged March 2020 threats of death and threats to delay Plaintiff's release from prison; and

- The alleged comment by one officer on April 12, 2020 that "the mess made by Plaintiff prior to the incident made [it] easier to stage a crime scene and that it was a good opportunity to capitalize."

(Doc. 13-1 at 5.)

Plaintiff also asserts that there is circumstantial evidence of a conspiracy, including the erasure of the April 12, 2020 surveillance recording and the alleged mail tampering that prevented Plaintiff from representing himself before the grand jury.  (*Id.* at 6.)  Defendants maintain that each of Plaintiff's specified allegations are unavailing.  (Doc. 14 at 6–7.)  The court

considers the sufficiency of the allegations with respect to each of the five alleged conspiracies specified in Count 9.[8]

### 1.    Conspiracy to Retaliate for Filing Grievances and Lawsuits

Plaintiff's retaliation claim appears in Count 3 and Defendants are not entitled to dismissal of that count for the reasons discussed above.  Count 9 alleges a *conspiracy* to retaliate against Plaintiff for filing lawsuits and grievances.  (Doc. 6 ¶ 393.)  As noted above, the alleged threats, physical abuse, and deprivation orders were all "part of a grand scheme to retaliate [against] Plaintiff for filing grievances and prevent Plaintiff from filing grievances and continuing legal claims."  (*Id.* ¶ 299.)  Plaintiff alleges that this conduct, in addition to the alleged "assault and battery" and malicious prosecution, was "preplanned and orchestrated by Defendants, mainly Defendant Thompson and Ferriter."  (*Id.* ¶ 303.)

The court concludes that the Amended Complaint lacks sufficient allegations that could plausibly support the alleged "grand scheme" to retaliate.  The Amended Complaint alleges that all 22 defendants conspired to retaliate against Plaintiff.  But the allegations do not plausibly support a conspiracy that broad.  For example, the Amended Complaint does not allege that John Doe 1 or 2 engaged in any retaliatory conduct; the only allegations against them are that they attacked Plaintiff without provocation on the day that he arrived at ECF.  *Cf. Suarez v. Kremer*, No. 03-CV-809, 2008 WL 4239214, at *11 (W.D.N.Y. Sept. 11, 2008) (ruling on summary

---

[8] Because the only claims against Defendants White and Hilton are failure-to-intervene claims that are not plausible for the reasons discussed above, the conspiracy claims against those defendants must also be dismissed.  *See Barnes v. County of Monroe*, 85 F. Supp. 3d 696, 727–28 (W.D.N.Y. 2015) ("Absent an underlying constitutional injury, a civil rights conspiracy claim cannot survive." (quoting *Johnson v. Rock*, No. 08-CV-1013, 2010 WL 3911389, at *7 (N.D.N.Y. Mar. 30, 2010))).

judgment that "plaintiff has merely lumped all correctional officers together, vicariously attributing the conduct of one correctional officer to another").

The Amended Complaint singles out Defendants Thompson and Ferriter as the "main" instigators of the alleged retaliation.  (Doc. 6 ¶ 303.)  The allegations against those defendants are more specific.  They both allegedly visited Plaintiff's cell about a week after Plaintiff grieved the February 8 incident and gave notice that he intended to file suit.  They both allegedly knew about Plaintiff's grievances and threatened Plaintiff with the same consequences for filing grievances and lawsuits: death and setting him up with a "new bid."  Drawing all reasonable inferences in Plaintiff's favor, Thompson and Ferriter followed through on those threats within a few weeks: Thompson's use of force and deprivation orders on April 8, and Ferriter's allegedly false accusation on April 12.  The court concludes that these allegations are sufficient at this stage of the case to constitute specific facts tending to show agreement and concerted action. This conclusion extends to Defendant Sears and to the other defendants who allegedly acted in concert to "stage a crime scene" on the date that the CERT team removed Plaintiff from his cell.

## 2.    Conspiracy to Prevent Plaintiff from Filing Grievances and Lawsuits

The second alleged conspiracy in Count 9 is a conspiracy to prevent Plaintiff from filing grievances and lawsuits.  This alleged conspiracy appears to be derived from Lt. Wilcox's and Misty O'Dell's alleged interceptions of Plaintiff's grievances at issue in Count 8.  But because Plaintiff has agreed to dismiss Count 8, there is no underlying constitutional violation available to support the alleged conspiracy.  *See Barnes v. County of Monroe*, 85 F. Supp. 3d 696, 727–28 (W.D.N.Y. 2015) ("Absent an underlying constitutional injury, a civil rights conspiracy claim cannot survive." (quoting *Johnson v. Rock*, No. 08-CV-1013, 2010 WL 3911389, at *7 (N.D.N.Y. Mar. 30, 2010))).

### 3. Conspiracy to Prevent Plaintiff from Accessing Court

This alleged conspiracy presumably springs from John Doe 5's alleged interception of Plaintiff's N.Y. Crim. Proc. Law § 190.50 letter.  The Amended Complaint alleges that John Doe 5 acted in "coordination" with multiple other defendants.  (Doc. 6 ¶ 346.)  But that allegation is entirely conclusory.  There are no allegations of any specific facts tending to show that John Doe 5's alleged conduct was the product of any agreement or concerted action with any other defendant.

### 4. Conspiracy to Physically Harm Plaintiff

Although not seeking dismissal of Plaintiff's excessive force claims in Count 1, the defense requests dismissal of the conspiracy claim in Count 9, including the alleged conspiracy to physically harm Plaintiff.

The court concludes that the Amended Complaint plausibly alleges a conspiracy among some of the defendants to use excessive force on January 23, 2020.  According to the Amended Complaint, John Does 1 and 2 were "waiting" for Plaintiff when he arrived at ECF (Doc. 6 ¶ 43) and attacked him without provocation while stating: "Welcome to Elmira, we know how to deal with scumbags like you here."  (*Id.* ¶ 49.)  Those allegations plausibly suggest that John Does 1 and 2 had at least tacitly agreed to attack Plaintiff and that they in fact acted in concert to do so.

The court concludes that the Amended Complaint plausibly alleges a conspiracy among some of the defendants to use excessive force on February 8, 2020.  Plaintiff alleges that Defendants Gilmore and Beschler and John Does 3 and 4 used excessive force on that date after Plaintiff "spat at them in protest" for taunting him.  (*Id.* ¶ 60.)  The circumstances plausibly support an inference of a tacit agreement to attack Plaintiff on that date.

### 5.      Conspiracy to Deprive Plaintiff of Access to Medical Care

The Amended Complaint alleges that, while in the medical room after the February 8

incident, Plaintiff overheard Sgt. Beschler advise Nurse Hakes that he would "help everyone

with getting their story straight." (Doc. 6 ¶ 77 (cleaned up).) Plaintiff asserts that Beschler's

statement demonstrates a "willingness to ignore Plaintiff's medical needs and conspire against

Plaintiff." (*Id.* ¶ 280.) The defense motion does not seek dismissal of the claim in Count 2 that

Dr. Ott, Nurse Hakes, and Sgt. Beschler were deliberately indifferent to Plaintiff's medical

needs. On the other hand, even drawing all reasonable inferences in Plaintiff's favor, the court

concludes that Beschler's single alleged utterance is insufficient to support any plausible claim

that Nurse Hakes, Dr. Ott, and Sgt. Beschler conspired to deprive Plaintiff of access to medical

care.

### B.      Intra-Agency Conspiracy Doctrine

Because at least some portions of Plaintiff's conspiracy claim survive, it is necessary to

consider the intra-agency conspiracy doctrine. The Second Circuit has recognized an

"intracorporate" (or intra-agency) conspiracy doctrine, which holds that "because employees

acting within the scope of their employment are agents of their employer, an employer and its

employees are generally considered to be a single actor, rather than multiple conspirators." *Fed.*

*Ins. Co. v. United States*, 882 F.3d 348, 368 (2d Cir. 2018). Plaintiff argues that the intra-agency

conspiracy doctrine does not apply for two reasons: (1) Plaintiff contends that the doctrine does

not apply to § 1983 claims; and (2) Plaintiff invokes the "personal stake" exception.

### 1.      The Intra-Agency Conspiracy Doctrine Applies to § 1983 Claims

Plaintiff contends that, although the Second Circuit Court of Appeals has recognized the

intra-agency conspiracy doctrine in the context of § 1985 actions, "it has not yet extended the

doctrine in the context of a Section 1983 action." (Doc. 13-1 at 6.) Those are accurate

statements of the law in this circuit. *See Warr v. Liberatore*, 270 F. Supp. 3d 637, 651

(W.D.N.Y. 2017) ("The Second Circuit has recognized the doctrine in the Section 1985

context . . . but has not yet determined its applicability to Section 1983 conspiracy claims."

(quoting *Hicks v. City of N.Y.*, 232 F. Supp. 3d 480, 497 (S.D.N.Y. 2007))). However, "[t]he

vast majority of district courts in this Circuit to have addressed the issue have found that the

doctrine applies to § 1983 claims." *Id.* This court has joined that majority to find that "the

rationale behind the intracorporate conspiracy rule . . . applies with equal force in the [§] 1983

context." *Id.* (second alteration in original; quoting *Chamberlain v. City of White Plains*,

986 F. Supp. 2d 363, 388 (S.D.N.Y. 2013)); *see also Colon v. City of Rochester*, 419 F. Supp. 3d

586, 595 (W.D.N.Y. 2019) (applying doctrine to § 1983 claim); *Ivery v. Baldauf*, 284 F. Supp.

3d 426, 440 (W.D.N.Y. 2018) (same). The court declines Plaintiff's invitation to find the

doctrine inapplicable to the § 1983 claims.

## 2.    The "Personal Stake" Exception

The "personal stake" exception allows suits against individuals within a single entity

"when they are pursuing personal interests wholly separate and apart from the entity." *Mazyck v.

Keller*, 531 F. Supp. 3d 630, 647 (W.D.N.Y. 2021) (quoting *Ali v. Connick*, 136 F. Supp. 3d 270,

282 (E.D.N.Y. 2015)). Plaintiff contends that the "personal stake" exception applies here

because the Amended Complaint includes allegations that Defendants acted under "a motive to

protect fellow officers from disciplinary actions or lawsuits." (Doc. 13-1 at 7.) Defendants insist

that the intra-agency conspiracy doctrine applies. (Doc. 14 at 7.)

Courts in the Second Circuit have applied the "personal stake" exception "when police

officers were alleged to have: covered up the use of excessive force . . . and assaulted a prisoner

29

in retaliation for his participation in a federal lawsuit." *Ali*, 136 F. Supp. 3d at 283 (citing *Hill v. City of New York*, No. 03 CV 1283, 2005 WL 3591719 (E.D.N.Y. Dec. 30, 2005), and *Medina v. Hunt*, No. 05-CV-1460, 2008 WL 4426748 (N.D.N.Y. Sept. 25, 2008)).  Plaintiff relies on both *Hill* and *Medina*.  (Doc. 13-1 at 7.)  The court concludes that the Amended Complaint includes sufficient allegations to plausibly support application of the "personal stake" exception as to the remaining conspiracy claims.

All of the defendants who allegedly conspired to physically attack Plaintiff on January 23 and February 8, 2020 would have been acting outside the normal course of their duties by agreeing to participate in those alleged attacks.  *See Edwards v. Annucci*, No. 17 CV 5018, 2019 WL 1284295, at *9 (S.D.N.Y. Mar. 20, 2019) ("Employing excessive force and falsifying documents are not core functions performed in the normal course of a correction officer's duties.").  Similarly, the personal-stake exception would apply to the defendants who allegedly issued unlawful retaliatory deprivation orders; to Defendant Ferriter for allegedly fabricating the April 12 throwing incident; and to the conduct of the officers who allegedly participated in capitalizing on that incident to stage a "crime scene."   (See Doc. 6, ¶ 209).

## Conclusion

Defendants' Partial Motion to Dismiss (Doc. 10) is MOOT insofar as it seeks dismissal of Count 8.  Plaintiff has withdrawn that count.  (Doc. 13-1 at 2 n.1.)

Defendants' Partial Motion to Dismiss (Doc. 10) is GRANTED IN PART and DENIED IN PART.  The motion to dismiss Count 3 is denied.  Count 7 is dismissed insofar as it is brought against Defendants White and Hilton.  Count 7 against Defendants Hakes, Wilcox, and Coolbaugh is dismissed except insofar as it alleges failure to intervene and restore Plaintiff's access to water, food, and medical supplies.  The motion to dismiss Count 7 is otherwise denied.

Count 9 is dismissed insofar as it is brought against Defendants White, Hilton, Ott, Hakes, Wilcox, O'Dell, and John Doe 5.  The motion to dismiss Count 9 is otherwise denied.

Dated this 15th day of November, 2023.

Geoffrey W. Crawford, Judge
United States District Court